**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

PUBLIC INTEREST LEGAL FOUNDATION, INC.

*Plaintiff*,

v.

PAUL ZIRIAX, in his official capacity as the Secretary of the State Election Board for the State of Oklahoma,

*Defendant*.

NO. 5:26-CV-01440-HE

# DEFENDANT'S MOTION TO DISMISS AND BRIEF IN SUPPORT

GARRY M. GASKINS, II, OBA #20212
*Solicitor General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Main: (405) 521-3921
Garry.Gaskins@oag.ok.gov

*Counsel for Defendant*

**JULY 20, 2026**

# TABLE OF CONTENTS

**INTRODUCTION** ........ 1

**BACKGROUND** ........ 2

**STANDARD OF REVIEW** ........ 5

**ARGUMENT** ........ 6

**I. This Court Does Not Have Jurisdiction to Decide Plaintiff's Claims Because Plaintiff Lacks Standing.** ........ 6

**II. Plaintiff Fails to State a Claim for Relief Under the National Voter Registration Act (Count 1).** ........ 11

**A. States' voter lists are not required to be disclosed under the NVRA.** ........ 11

**B. Principles of statutory construction support holding that 52 U.S.C. § 20507(i) does not mandate unfettered access to Oklahoma's voter list.** ........ 16

**1.** ***Plain Meaning*** ........ 17

**2.** ***Context*** ........ 19

**III. Plaintiff Fails to State a Claim for Relief Under the Fourteenth Amendment and 42 U.S.C. § 1983 (Count 2).** ........ 21

**CONCLUSION** ........ 22

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ... 5

*Campaign Legal Ctr. v. Scott*,
49 F.4th 931 (5th Cir. 2022) ... 8

*Casillas v. Madison Ave. Assocs.*,
926 F.3d 329 (7th Cir. 2019) ... 8

*Clark v. Jeter*,
486 U.S. 456 (1988) ... 21

*Colon–Marrero v. Velez*,
813 F.3d 1 (1st Cir. 2016) ... 2

*Deal v. United States*,
508 U.S. 129 (1993) ... 17

*Heller v. Doe*,
509 U.S. 312 (1993) ... 22

*Holt v. United States*,
46 F.3d 1000 (10th Cir. 1995) ... 6

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978) ... 22

*Kelly v. RealPage Inc.*,
47 F.4th 202 (3d Cir. 2022) ... 9

*Lowery v. Ala. Power Co.*,
483 F.3d 1184 (11th Cir. 2007) ... 18

*McBurney v. Young*,
569 U.S. 221 (2013) ... 22

*McGowan v. Maryland*,
366 U.S. 420 (1961) ... 22

*Neitzke v. Williams*,
490 U.S. 319 (1989) ... 6

*PILF v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ... 13, 14

*PILF v. Benson*,
136 F.4th 613 (6th Cir. 2025) ... 8, 9, 10, 11

*PILF v. Nago*,
174 F.4th 664 (9th Cir. 2026) ....................12

*PILF v. Sec'y of Commonwealth of Pa.*,
136 F.4th 456 (3d Cir. 2025) ....................8, 9

*Project Vote/Voting for America, Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) ....................16

*Raines v. Byrd*,
521 U.S. 811 (1997) ....................7

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ....................7

*Thomas v. Metro. Life Ins.*,
631 F.3d 1153 (10th Cir. 2011) ....................16, 17

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ....................6, 7, 8, 11

*United States v. Anderson*,
46 F.4th 1000 (9th Cir. 2022) ....................14

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026) ....................12

*United States v. Burkholder*,
816 F.3d 607 (10th Cir. 2016) ....................17

*United States v. Hinckley*,
550 F.3d 926 (10th Cir. 2008) ....................17

*United States v. Titley*,
770 F.3d 1357 (10th Cir. 2014) ....................22

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025) ....................14, 15, 16

*Wachovia Bank, N.A. v. United States*,
455 F.3d 1261 (11th Cir. 2006) ....................17

*Wyoming v. United States*,
279 F.3d 1214 (10th Cir. 2002) ....................6

**Statutes**

OKLA. STAT. tit. 26, § 7-103.2 ....................5, 22

52 U.S.C. § 20501 ....................2, 19

52 U.S.C. § 20503 ....................3

52 U.S.C. § 20506 ....................3

52 U.S.C. § 20507 ....................1, 3, 4, 12, 16, 17

52 U.S.C. § 20510 ....................................................................................................4, 8

52 U.S.C. § 21083 ....................................................................................................13

**Constitutional Provision**

U.S. CONST. amend. XIV, § 1 ....................................................................................21

**Rules**

Fed. R. Civ. P. 12 ....................................................................................................5, 6

**Other Authorities**

WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE (2001) ....................................................................................................18

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) ..............................................18

## INTRODUCTION

Plaintiff—a Virginia-based organization—claims that it should have unfettered access to Oklahoma's voter rolls, which include the personal identification information of Oklahoma citizens. To support its stance, however, Plaintiff puts forth a strained interpretation of federal law. The National Voter Registration Act ("NVRA") provides that "[e]ach State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C § 20507(i). As a simple matter of plain meaning, records regarding the "implementation" of "programs" and "activities" for list maintenance are to be made available for inspection. But programs and activities for list maintenance are something different altogether from the voter lists themselves and the personal information contained on those lists. If Congress intended to make such information public, it would certainly have said so directly. Plaintiff's NVRA claim fails as a matter of law.

Plaintiff also makes an equal protection claim, and that claim likewise fails. Oklahoma law restricts access to its voter rolls primarily to its citizens. And Oklahoma's law easily survives rational basis review because it is rationally related to the legitimate government interest of safeguarding the personal identification information of Oklahoma citizens.

Most importantly, not only do Plaintiff's legal arguments fail, but Plaintiff lacks standing to have its arguments decided by this Court. Plaintiff cannot show injury-in-fact. Plaintiff merely alleges an informational injury but can show no concrete downstream consequences. Such a flaw is fatal to this case. As explained in further detail below, this Court

should dismiss Plaintiff's Complaint for lack of standing, or, in the alternative, for failure to state a claim.

## BACKGROUND

The National Voter Registration Act took effect on January 1, 1995. In its first section, Congress explicitly stated the findings and purposes underlying the Act. 52 U.S.C. § 20501. Congress found "(1) the right of citizens of the United States to vote is a fundamental right; (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." *Id.* § 20501(a)(1)–(3). Thus, the stated purposes of the NVRA are: "(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office; (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office; (3) to protect the integrity of the electoral process; and (4) to ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(1)–(4). Further, the NVRA's "primary emphasis" is to "simplify[] the methods for registering to vote in federal elections." *Colon–Marrero v. Velez*, 813 F.3d 1, 9 n.13 (1st Cir. 2016).

In addition to other methods of voter registration provided under State law, the NVRA requires that each State establish the following three procedures to register to vote in Federal elections: (1) pursuant to Section 5, "by application made simultaneously with an application for a motor vehicle driver's license"; (2) pursuant to Section 6, "by mail application"; and (3)

pursuant to Section 7, "by application in person" at a voter registration agency ("VRA"). 52 U.S.C. § 20503(a)(1)–(3). Section 7 defines VRAs and includes the requirement that States designate as VRAs "all offices in the State that provide public assistance" and "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities." *Id.* § 20506(a)(2).

Section 8 of the NVRA, titled "Requirements with respect to administration of voter registration," addresses the States' administration of voter registration to "ensure that any eligible voter is registered to vote in an election." *Id.* § 20507(a)(1). Section 8 provides that "[a]ny state program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll" "shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965," and it shall not remove "the name of any person … by reason of the person's failure to vote." *Id.* § 20507(b). Subsections (c), (d), (e), and (f) provide a comprehensive process for considering removal based on change of address and where a registrant shall cast his or her vote. Subsection (c) also places a time limit on removing voters from a roll prior to an election; the process for removal of a voter must be completed "not later than 90 days prior to the date of a primary or general election for Federal office." *Id.* § 20507(c)(2)(A).

The final substantive provision of Section 8—the section at issue here—is subsection (i), entitled "Public disclosure of voter registration activities." Subsection (i) provides:

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a

> declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.
>
> (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

*Id.* § 20507(i).

Under Section 11 of the NVRA, the United States Attorney General "may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this chapter." *Id.* § 20510(a). Section 11 also provides a private right of action:

> (1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.
>
> (2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1) ..., the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

*Id.* § 20510(b)(1)–(2).

Plaintiff, Public Interest Legal Foundation, Inc. ("PILF"), filed this lawsuit against the Secretary of Oklahoma's State Election Board, Paul Ziriax, in his official capacity, alleging violations of Section 8 of the NVRA and the Fourteenth Amendment.

A Virginia-based organization, PILF characterizes itself as "a non-partisan, public interest organization" that "seeks to promote the integrity of the electoral process nationwide through research, education, remedial programs, and litigation." Doc. 1 at 2, ¶ 4. PILF takes the erroneous position that the NVRA's disclosure provision mandates unfettered access to Oklahoma's voter rolls.

With a few exceptions, Oklahoma law limits access to its voter list to Oklahoma residents who are also United States citizens. OKLA. STAT. tit. 26, § 7-103.2(B)(1). On April 20, 2026, PILF emailed a letter to the Oklahoma State Election Board claiming that the Election Board was in violation of the NVRA for failure to permit PILF's inspection of the Oklahoma statewide voter registration list. Doc. 1 at 6, ¶¶ 20–22. In response, Secretary Ziriax explained that Oklahoma's electronic voter list does not fall under "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" as defined by the NVRA. Doc. 1 at 6, ¶ 23. This lawsuit followed.

**STANDARD FOR DISMISSAL**

Defendant brings this motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although courts must view a complaint in a light most favorable to the nonmoving party, drawing all reasonable inferences therefrom, courts need not accept as true "labels and conclusions," legal characterizations, unwarranted deductions of fact, or "naked assertions devoid of further factual enhancement." *Id.* at 678–79 (citation omitted).

Further, when a complaint presents a question of law and "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," the complaint "must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Neitzke v. Williams*, 490 U.S. 319, 327

(1989) (citation omitted). Rule 12(b)(6), in short, "authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Id.* at 326; *see also Wyoming v. United States*, 279 F.3d 1214, 1222 (10th Cir. 2002).

Defendant also moves for dismissal under Rule 12(b)(1). Such motions take one of two forms: a facial attack, which questions the sufficiency of the complaint's allegations of subject-matter jurisdiction, or a factual attack, which goes beyond the pleadings and challenges the facts upon which subject-matter jurisdiction depends. *Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995). In reviewing a facial attack, such as the one presented here, the Court must accept the allegations of the complaint as true. *Id.* at 1002. Because standing implicates the Court's subject-matter jurisdiction, it is properly addressed under Rule 12(b)(1).

## ARGUMENT

### I. THIS COURT DOES NOT HAVE JURISDICTION TO DECIDE PLAINTIFF'S CLAIMS BECAUSE PLAINTIFF LACKS STANDING.

Under Article III of the Constitution, "[f]ederal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities. And federal courts do not issue advisory opinions." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021). Rather, the federal judicial power is confined "to the resolution of 'Cases' and 'Controversies.'" *Id.* at 423. "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). Further, "[a]s the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing." *Id.* at 430–31.

To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* at 423. Concerning concrete harm, the Supreme Court has emphasized: "No concrete harm, no standing." *Id.* at 417. "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms …." *Id.* (citation omitted).

Importantly, "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III." *Id.* at 426. Indeed, the Supreme Court has "rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" *Id.* (quoting *Spokeo*, *Inc. v. Robins*, 578 U.S. 330, 341 (2016)). In other words, Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Id.* at 426 (quotation omitted). To the contrary, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* (quotation omitted). As explained by the Supreme Court:

> For standing purposes, therefore, an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law. Congress may enact legal prohibitions and obligations. And Congress may create causes of action for plaintiffs to sue defendants who violate those legal prohibitions or obligations. But under Article

> III, an injury in law is not an injury in fact. Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court. As then-Judge Barrett succinctly summarized, "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions."

*Id.* at 426–27 (quoting *Casillas v. Madison Ave. Assocs.*, 926 F.3d 329, 332 (7th Cir. 2019)). Moreover, in *TransUnion* the Supreme Court made clear that, when asserting an informational injury, a plaintiff must show "'downstream consequences' from failing to receive the required information." *Id.* at 442 (citation omitted). On the flip side, "[a]n 'asserted informational injury that causes no adverse effects cannot satisfy Article III.'" *Id.* (citation omitted).

Here, though the NVRA creates a private right of action for a person who is "aggrieved" by a violation of the NVRA, 52 U.S.C. § 20510(b), PILF still must show—in order to satisfy Article III standing—that it has suffered an injury in fact that is "concrete, particularized, and actual or imminent." *TransUnion*, 594 U.S. at 423. PILF has not done so. Indeed, PILF's claims under the NVRA have been dismissed by two circuit courts for a lack of standing. In those cases, PILF did not satisfy the injury-in-fact requirement because it could not show that the denial of record requests caused a concrete downstream injury. *See PILF v. Sec'y of Commonwealth of Pa.*, 136 F.4th 456 (3d Cir. 2025); *PILF v. Benson*, 136 F.4th 613 (6th Cir. 2025); *see also Campaign Legal Ctr. v. Scott,* 49 F.4th 931 (5th Cir. 2022) (plaintiffs failed to establish an informational injury, as they had failed to demonstrate concrete downstream consequences from Texas's failure to produce records requested under the NVRA).

In its case, the Third Circuit analyzed PILF's standing in light of the Supreme Court's holding in *TransUnion* regarding informational injuries. The Third Circuit recognized, correctly, that "to state a cognizable informational injury a plaintiff must allege that they failed to receive

… required information, and that the omission led to adverse effects or other downstream consequences, *and such consequences have a nexus to the interest Congress sought to protect.*" *PILF*, 136 F.4th at 464 (quoting *Kelly v. RealPage Inc.*, 47 F.4th 202, 214 (3d Cir. 2022)). PILF argued that it suffered three "adverse effects" or "downstream consequences": (1) it was prevented from studying and analyzing the voter list maintenance activities, (2) the State frustrated PILF's production and dissemination of educational materials, and (3) PILF had expended considerable time and resources. *Id.* at 467. The Third Circuit rejected each of these arguments; these activities, the court held, were not "essential to a concrete interest protected by the [NVRA]." *Id.* at 467–69. That is, the Third Circuit held that there was "an insufficient nexus among the downstream consequences identified by PILF and the interest that Congress sought to protect." *Id.* at 467. The court noted that "[t]o 'study and analyze' and 'scrutinize' records … is not an enumerated purpose of the NVRA nor do these aims advance the expansion of voter registration and participation in federal elections." *Id.* The court also found it significant that "PILF ha[d] no ties to Pennsylvania or any of its voters." *Id.* In sum, the Third Circuit held that PILF lacked standing because "it failed to identify some *specific* adverse downstream consequence for its mission or future plans that has a nexus to the interest Congress sought to protect in enacting the NVRA, namely the expansion of voter participation in federal elections." *Id.* at 469.

The Sixth Circuit came to the same conclusion, holding that PILF failed to show a sufficient injury under Article III because it "fail[ed] to articulate specific downstream consequences." *Benson*, 136 F.4th at 632. There, PILF again alleged that, by not providing requested records, Michigan's Secretary of State prevented PILF "from engaging in its

research, educational, and remedial activities." *Id.* at 631. The Sixth Circuit held that this was "at most, a vague and unspecific injury." *Id.* The court further observed that "PILF is not a registered voter, nor has it claimed organizational standing on behalf of registered voters, in the voting jurisdiction at issue." *Id.*

PILF's standing arguments fare no better here. In an effort to establish standing in the instant case, PILF alleges that, by denying full access to Oklahoma's statewide voter registration list, Secretary Ziriax is (1) preventing it from "proposing best practices and solutions that will assist Oklahoma in carrying out its voter list maintenance programs and activities to help ensure Oklahoma's voter roll is accurate and current," (2) preventing it from "speaking (and educating) about matters of public importance—including erroneous disenfranchisement of voters and the currency and accuracy of the Statewide Voter Registration List," (3) impairing its "ability to provide policy advice to state and local officials and legislative guidance and testimony to Congress regarding state compliance with voting rights legislation," (4) impairing its "accumulation of current and timely institutional knowledge," which harms its ability to "educate the public and election officials about the state of the voter roll," and (5) preventing it from "study[ing] and analyz[ing] Oklahoma's voter list maintenance activities and Oklahoma's compliance with state and federal laws, and other best practices." Doc. 1 at 9–12, ¶¶ 41–45. PILF also alleges that it plans to write a report that "*may* document deceased registrants, duplicated records, and other errors, mistakes, and inaccuracies" in Oklahoma's voter list. Doc. 1 at 12, ¶ 47 (emphasis added).

In sum, PILF alleges, as it did unsuccessfully in the Third and Sixth Circuits, that it has been prevented from conducting research, educational, and remedial activities. PILF's alleged

injuries are far from concrete. Notably, the alleged injuries lack "a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms." *TransUnion*, 594 U.S. at 417. PILF's alleged injuries are plainly vague and speculative. Nor do they have a sufficient nexus to the primary interest Congress sought to protect in enacting the NVRA—"the expansion of voter participation in federal elections." *See PILF*, 136 F.4th at 467. Moreover, PILF alleges no ties to Oklahoma or any of its voters. Thus, PILF lacks standing because it has failed to show specific, concrete downstream injuries. This Court should follow the lead of the Third and Sixth Circuits and dismiss the case.

## II. PLAINTIFF FAILS TO STATE A CLAIM FOR RELIEF UNDER THE NATIONAL VOTER REGISTRATION ACT (COUNT 1).

### A. States' voter lists are not required to be disclosed under the NVRA.

Again, Section 8(i) of the NVRA, entitled "Public disclosure of voter registration activities," provides:

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.
>
> (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507(i)(1)–(2).

The issue here is whether a statewide voter list is a "record" concerning the "implementation" of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters within the meaning of the NVRA. *Id.* § 20507(i)(1). The Ninth Circuit decided this very issue (against PILF) in *PILF v. Nago*, where it held that "based on the text and statutory structure of the NVRA," a statewide voter list is not a record under the NVRA "because covered 'records' are those about efforts to ensure the accuracy of voter lists, *not voter lists themselves*." 174 F.4th 664, 679 (9th Cir. 2026) (emphasis added); *see also United States v. Benson*, 819 F. Supp. 3d 753, 764 (W.D. Mich. 2026), *aff'd*, 179 F.4th 470 (6th Cir. 2026) ("[A] natural reading of § 20507(i) suggests that it requires states to disclose information regarding the process by which they maintain their voter registration list but not the list itself.").

Moreover, the Ninth Circuit explained that "the phrase requiring that each state maintain covered records 'for at least 2 years,' makes even clearer that statewide voter lists are not themselves 'records' that must be disclosed." *Nago*, 174 F.4th at 680. This requirement "reinforces that Congress was focused on historical documentation of how states conduct list maintenance, not on the voter lists themselves, which constantly evolve as voters are added or removed, or as their data are updated." *Id.* "Were any 'official list[] of eligible voters' itself a 'record' subject to section 20507(i)(1), states would be obliged to preserve every interim version of the ever-changing lists for two years—a plainly unworkable and implausible result that we must avoid." *Id.* "Section 20507(i)(1) of the NVRA is not a sprawling voter-data-preservation mandate; it is a transparency provision targeted at list-maintenance activities." *Id.*

Yet another reason relied upon by the Ninth Circuit in finding that voter lists are not records subject to disclosure under the NVRA is the fact that "voter lists are governed by a later-enacted, separate statute—the Help America Vote Act." *Id.* at 681. The Help America Vote Act, enacted in 2002, "mandates that each State maintain a single, uniform, computerized statewide voter-registration list for use by election officials." *Id.* (citing 52 U.S.C. § 21083(a)(1)). Importantly, "the Help America Vote Act does not have a public disclosure provision, nor does it create a private right of action for enforcement." *Id.* Accordingly, the Ninth Circuit "decline[d] to read the NVRA to provide a right for the public to access statewide voter lists when Congress chose not to establish that right in the statute specifically addressing the creation of statewide voter lists." *Id.*

PILF, again, was the plaintiff before the Ninth Circuit in *Nago*. In *Nago*, as in its Complaint here, PILF invoked the First Circuit's decision in *PILF v. Bellows*, 92 F.4th 36 (1st Cir. 2024), "where the court concluded that a statewide voter registration list *was* subject to disclosure under section 20507(i)(1)." *Id.* at 682 (emphasis added). But for good reason, the Ninth Circuit refused to adopt the holding in *Bellows*. This Court should likewise decline to follow the logic used by First Circuit.

In *Bellows*, "the First Circuit reasoned that because such lists record the 'end result of [list maintenance] activities,' which are conducted to ensure accuracy of the lists, the lists necessarily 'concern[ ]' the 'implementation' of those activities." *Id.* (quoting *Bellows*, 92 F.4th at 47). This reading, per the Ninth Circuit, "seems inconsistent with the statutory text and structure to such an extent that we must reach a different outcome, though we do not do so lightly." *Id.* (citing *United States v. Anderson*, 46 F.4th 1000, 1005 (9th Cir. 2022) (explaining that

in "cases requiring statutory interpretation, … [o]ur analysis is informed by decisions from other circuit courts that have interpreted the statute, and we will not create a circuit split unnecessarily")).

Under the First Circuit's approach in *Bellows*, a statewide voter list is "inherently a record concerning list-maintenance programs." *Nago*, 174 F.4th at 682. But "the best reading of the statute is that such lists are not records concerning the implementation of those programs, which are covered by section 20507(i)(1), but rather the *objects* of the implemented programs, which are not." *Id.* The First Circuit's interpretation is problematic because it "collapses the textual distinction between administrative records reflecting implementation of list-maintenance activities and the lists those programs maintain." *Id.* And "[i]ts interpretation gives too much weight to the words 'all' and 'concerning,' failing to take account of the surrounding limiting context." *Id.* (citation omitted).

In its Complaint, PILF also relies on the Tenth Circuit's recent decision in *Voter Reference Foundation, LLC v. Torrez*, 160 F.4th 1068, 1084 (10th Cir. 2025). However, the Tenth Circuit's holding in *Torrez* is not at odds with the Ninth Circuit's holding in *Nago* or with Defendant's argument here. *Torrez* dealt primarily with whether an organization could publish New Mexico's voter data on its private website, whether the word "record" included electronic records, and whether New Mexico was required to turn over records that did not yet exist. *See generally Torrez*, 160 F.4th 1068.

The plaintiff in *Torrez* received New Mexico's voter data from a third party who requested it from the New Mexico Secretary of State's Office. *Id.* at 1073–74. At the time, New Mexico "mandated that voter data be used only for a governmental use, campaign use,

or election related purpose." *Id.* at 1074. After receiving the voter data, the plaintiff "posted it on its public website with a press release" regarding a discrepancy "between the number of voters who voted in 2020, and the number of ballots reported in the State's voter history." *Id.* New Mexico took the stance that the plaintiff had violated its use restrictions by posting personal voter data on a private website. *Id.* at 1074–75.

The plaintiff later requested additional records. "[S]pecifically, it requested data on registered voters who cast a ballot in November 2020 but were subsequently dropped from active status between November 2020 and April 2021." *Id.* at 1075. The New Mexico Secretary of State's Office did not provide those records, reasoning that it was not required to provide those records under the NVRA because filling that request would require the creation of new records that did not yet exist. *Id.* at 1076. New Mexico also maintained that it did not produce the requested data because the plaintiff was going to publish it on its website in violation of New Mexico's Election Code. *Id.* at 1084.

The Tenth Circuit ultimately held that New Mexico's use restrictions were preempted by the NVRA via conflict preemption. *Id.* at 1082. After holding that those portions of New Mexico's election code had been preempted, the court turned to New Mexico's alternative arguments centering around the NVRA's definition of "record." *Id.* at 1084. As noted by the Ninth Circuit in *Nago*, *Torrez* did not address the argument at issue here: "whether a voter [list] concerns the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists." *Nago*, 174 F.4th at 682 n.11. As the Tenth Circuit explicitly stated in *Torrez*, "the parties focus[ed] their arguments not on whether the requested voter data in fact concern[ed] the *implementation* of relevant programs and activities

but on whether 'record' includes dynamic, electronic documents and whether they encompass data that is allegedly 'newly created.'" *Torrez*, 160 F.4th at 1084 (emphasis added). Thus, *Torrez* is distinguishable.

PILF also relies on the Fourth Circuit's decision in *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012). However, the holding in *Long* is not inconsistent with Defendant's argument here or with the Ninth Circuit's holding in *Nago*. *Nago*, 174 F.4th at 682. In *Long*, "the Fourth Circuit held that voters' registration *applications* were covered by the public disclosure provision because they were direct evidence of the implementation of registration procedures." *Nago*, 174 F.4th at 682 (citing *Long*, 682 F.3d at 336–37). "Importantly, though, the [*Long*] court did not hold that entire statewide voter lists fall within section 20507(i)." *Id.* "That distinction is crucial: an application and its processing relate to the implementation of a program to ensure currency and accuracy of voter lists, whereas a statewide list of registered voters is a continuously updated product of those activities." *Id.*

**B. Principles of statutory construction support holding that 52 U.S.C. § 20507(i) does not mandate unfettered access to Oklahoma's voter list.**

When construing a statute, the analysis begins with the plain language of the statute. *Thomas v. Metro. Life Ins.*, 631 F.3d 1153, 1161 (10th Cir. 2011). The words of a statute are considered "in their context and with a view to their place in the overall statutory scheme." *Id.* "If the statutory language is clear," the analysis ends there and the plain meaning must be applied. *Id.* However, "[i]f the court finds the statute ambiguous, the court then looks beyond the plain text to resolve the ambiguity, examining legislative intent [and] overall statutory construction." *Id.* (quoting *United States v. Hinckley*, 550 F.3d 926, 932 (10th Cir. 2008)). A

statute is ambiguous if "it is capable of being understood by reasonably well-informed persons in two or more different senses." *Id.*

Importantly, it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *United States v. Burkholder*, 816 F.3d 607, 615 n.6 (10th Cir. 2016) (quoting *Deal v. United States*, 508 U.S. 129, 132 (1993)). Indeed, when it comes to statutory construction, "context is king." *Wachovia Bank, N.A. v. United States*, 455 F.3d 1261, 1267 (11th Cir. 2006). A reviewing court "should not restrict [itself] to examining a particular statutory provision in isolation .... [t]he meaning, or lack thereof, of certain words or phrases may only come to light when placed in the appropriate context." *Id.*

At issue here is the scope of the Section 8(i) disclosure provision. Section 8(i) requires disclosure of only those records that concern the "implementation of programs and activities" to ensure the accurate and current official lists of eligible voters. 52 U.S.C. § 20507(i)(1). The record requested by PILF—Oklahoma's complete list of registered voters—is not a "record" within the meaning of Section 8(i) because the voter list does not "concern[] the *implementation* of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* § 20507(i)(1) (emphasis added).

### *1. Plain Meaning*

The analysis here begins with the common and ordinary meaning of the term "implementation." To "implement" means:

(1) to "carry out," "esp[ecially] to give practical effect to and ensure of actual fulfillment by concrete measures." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1134 (1993);

(2) "to fulfill; perform; carry out," or "to put into effect according to or by means of a definite plan or procedure." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY 961 (2001);

Also relevant are the terms "program" and "activity." A "program" is:

(1) "a schedule or system under which action may be taken toward a desired goal." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1812 (1993);

(2) "a plan of action to accomplish a specified end" or "a plan or schedule of activities, procedures, etc., to be followed." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY 1546 (2001);

An "activity" is:

(1) a "natural or normal function or operation." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 22 (1993);

(2) "a specific deed, action, function, or sphere of action." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 20 (2001).

It is clear from the foregoing definitions and the plain language of the statute that the "records" subject to public disclosure under Section 8(i) of the NVRA must relate to fulfilling, performing, carrying out, or putting into effect by means of a definite plan or procedure systems or specific actions to ensure that a State's official list of registered voters is current and accurate. Textually, Section 8(i) does not mandate unfettered access to the voter lists themselves.

If Congress intended a disclosure requirement encompassing information more broad than process information, it surely would not have chosen to include the word "implementation." *See Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1204 (11th Cir. 2007) ("[W]e must construe [a] statute to give effect, if possible, to every word and clause."). Without the word "implementation," the provision would be broader, requiring disclosure simply of "all records relating to programs and activities." It is thus reasonable to interpret "implementation" as restricting the scope of the records required to be disclosed. Interpreting Section 8(i) to require

disclosure of records relating to the processes a State implements to fulfill its NVRA obligations is in harmony with the plain language of the statute.

### *2. Context*

It is clear from the context of the entire NVRA that Congress intended for Section 8(i) to require transparency regarding state programs and processes for adding and removing voters from their voter rolls, not the voter rolls themselves.

Congress passed the NVRA after finding that "discriminatory and unfair registration laws and *procedures* can have a direct and damaging effect on voter participation." 52 U.S.C. § 20501(a)(3) (emphasis added). Section 8 of the NVRA—the section that contains the statute at issue here—is titled "Requirements with respect to *administration* of voter registration." *Id.* § 20507 (emphasis added). Under Section 8, the State is required to abide by a host of procedures. For example, states must provide notice to applicants regarding the disposition of their application. *Id.* § 20507(a)(2). And "the name of a registrant may not be removed from the official list of eligible voters" except "at the request of the registrant[,]" "as provided by State law, by reason of criminal conviction or mental incapacity," or by "a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" because of death of a registrant or a change in the registrant's residence. *Id.* § 20507(a)(3)–(4).

Section 8 further provides that "[a]ny state program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll … shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965" and shall not remove "the name of any person … by reason of the

person's failure to vote." *Id.* § 20507(b). Subsections (c), (d), (e), and (f) provide a comprehensive process for considering removal based on change of address and where a registrant shall cast their vote. Section 8(d) provides that States may not remove a registrant from the voter roll on the ground that he changed his address unless (1) the registrant confirms in writing that he has moved outside the registrar's jurisdiction or (2) the registrant (i) fails to respond to a specific notice about voting and address changes, and (ii) has not voted, or appeared to vote, during a defined time period. *Id.* § 20507(d)(1)–(2). And the process for removal of a voter must be completed "not later than 90 days prior to the date of a primary or general election for Federal office." *Id.* § 20507(c)(2)(A).

It is after each of these extensive requirements, in Section 8(i), that the public disclosure provision was inserted by Congress, requiring states to "maintain for at least 2 years" and to "make available for public inspection … all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* § 20507(i)(1). Indeed, "[t]he public disclosure provision serves a transparency function," ensuring that the public may have access to certain data to "verify that list-maintenance activities are implemented lawfully and not in a manner that causes 'poor and illiterate voters [to be] caught in a purge system which will require them to needlessly re-register.'" *Nago*, 174 F.4th at 668 (citing Senate Report No. 103-6, at 18, 32 (1993) ("The [Senate Committee on Rules and Administration] is mindful of the need to keep accurate and current voter rolls. The Committee is concerned that such programs can be abused and may result in the elimination of names of voters from the rolls solely due to their

failure to respond to a mailing. Abuses may be found in the design of a program as well as in its implementation.”)).

When considered in context, what Congress clearly intended was disclosure of records that show whether the states’ processes for registering and removing voters are in compliance with Section 8. In short, “[e]ffective oversight does not require disclosure of every registrant’s personal information; it requires transparency about how list-maintenance programs are implemented,” and that is exactly what Congress required. *Nago*, 174 F.4th at 683.

### III. PLAINTIFF FAILS TO STATE A CLAIM FOR RELIEF UNDER THE FOURTEENTH AMENDMENT AND 42 U.S.C. § 1983 (COUNT 2).

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall “deny to any person within its jurisdiction the equal protection of the laws.” U.S. CONST. amend. XIV, § 1. In considering whether state legislation violates the Equal Protection Clause, different levels of scrutiny are applied to different types of classifications. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Classifications based on race or national origin, and classifications affecting fundamental rights, are given strict scrutiny. *Id.* Intermediate scrutiny has generally been applied to discriminatory classifications based on sex or illegitimacy. *Id.* But “[a]t a minimum” a statutory classification must survive rational basis review, meaning the statutory classification must be “rationally related to a legitimate governmental purpose.” *Id.* “Under rational basis review, the law in question ‘is accorded a strong presumption of validity.’” *United States v. Titley*, 770 F.3d 1357, 1359 (10th Cir. 2014) (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)). A statutory challenge must be denied “if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.” *Id.* Further, “[t]he constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the

achievement of the State's objective." *Id.* (quoting *McGowan v. Maryland*, 366 U.S. 420, 425 (1961)). And "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Id.* (quoting *Heller*, 509 U.S. at 320).

The Oklahoma law challenged here, OKLA. STAT. tit. 26 § 7-103.2(B)(1), need only survive rational basis review. Access to government records is not a fundamental right, *see Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978), and PILF alleges no suspect classification. PILF alleges that there is no rational basis for limiting full access to Oklahoma's statewide voter registration list. Doc. 1 at 13, ¶ 57. But that is incorrect.

Oklahoma has a legitimate interest in safeguarding the personal identification information of its citizens. That is the rational basis for the classification in OKLA. STAT. tit. 26 § 7-103.2(B)(1). Oklahoma is protecting its citizens from bad actors who may sell or otherwise improperly use their personal identification information. *Cf. McBurney v. Young*, 569 U.S. 221, 226–28 (2013) (upholding Virginia's citizens-only public-records provision because a State's records regime exists to serve its own citizens). Oklahoma likewise has a legitimate interest in deterring the commercial harvesting and resale of its voters' data. And it is PILF's burden to negate every conceivable basis that might support the classification—a burden its Complaint cannot carry. *Heller*, 509 U.S. at 320.

## **CONCLUSION**

Plaintiff's Complaint should be dismissed for lack of subject-matter jurisdiction and, alternatively, with prejudice for failure to state a claim.

Respectfully Submitted,

*s/Garry M. Gaskins, II*

GARRY M. GASKINS, II, OBA NO. 20212
*Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Main: (405) 521-3921
Garry.Gaskins@oag.ok.gov

*Counsel for Defendant*